WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Aliesther Jacobo-Esquivel, | No. CV-14-01781-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Dustin Hooker, et al., | |
| Defendants. | |

Pending before the Court are the Motion for Summary Judgment by Defendants (Doc. 94) and the Motion for Partial Summary Judgment by Plaintiff Jacobo-Esquivel (Doc. 95.)  For the following reasons, the Court denies both motions.

## BACKGROUND

On January 10, 2013, Officers Dustin Hooker and Daniel Beau Jones were patrolling the residential neighborhood surrounding 67th Avenue and Lower Buckeye Road in a fully marked City of Phoenix Police Department vehicle.  They noticed a maroon 2002 Jeep Liberty parked in the driveway of the house at 6432 W. Cordes Road, Phoenix, Arizona.  Officer Jones ran the Arizona license plate and found that it had been registered about two weeks prior to a nearby address.

A year and a half earlier the officers had searched the house with the consent of the residents who lived there at that time.  Based on this previous contact, the officers stated that they believed the house on Cordes Road had once been a drug stash house,[1]

---

[1] On April 18, 2011, Officers Hooker and Jones had contact with a house located at 6432 W. Cordes Road, Phoenix, Arizona.   They had been patrolling the residential

1   and it was their experience with stash houses that drug traffickers register their vehicles

2   to false addresses so as not to give up the location of their stash house.  Officers Hooker

3   and Jones decided to park down the street and try to make contact with anyone who left

4   the residence.

5        At approximately 11:00 a.m., Plaintiff Jacobo-Esquivel exited the house and

6   headed toward the Jeep parked in the driveway.  He was joined by Jhovanny Vidal-

7   Ramirez.[2]  Officer Hooker drove the patrol car to the residence.  The parties dispute

8   whether Officer Hooker parked directly behind the Jeep so as to block the driveway.

9   (*Compare* Doc. 96 at ¶ 7 *with* Doc. 99 at ¶ 7.)  Officer Jones exited the patrol car and

10  approached the driver's side of the Jeep.

11       The parties provide differing accounts of the events that transpired.  According to

12  Jacobo-Esquivel, he and Vidal-Ramirez were both seated in the Jeep with the engine

13  running when the patrol car pulled into the driveway behind the Jeep and Officer Jones

14  approached.  Jacobo-Esquivel tried to step outside the Jeep to determine why the officers

15  were on his property, but as he placed one foot outside the Jeep, Officer Jones ordered

16  him to get back in and demanded to see identification from both men.  After taking their

17  identification cards, Officer Jones ordered Jacobo-Esquivel to get out of the Jeep.  He

18  complied.  Officer Jones immediately frisked him and handcuffed him.

19       Meanwhile, Officer Hooker approached the passenger side of the Jeep and

20

21  neighborhood surrounding 67th Avenue and Lower Buckeye Road when they saw a

22  silver Acura driving faster than the speed limit pull into the driveway of 6432 W. Cordes
    Road.  The officers approached the driver and asked if there was anything illegal in the

23  house.  The driver invited the officers to search the house.  The officers searched the
    entire house and garage and found a handgun in the closet of one of the bedrooms.  The

24  occupants of the house denied knowing who owned the gun and asked the officers to take
    it and impound it.  The officers advised the occupants that the owner could claim it out of

25  impound if he so desired.  (*See* Doc. 99-11 (police report for the 2011 incident)).
    Officers Hooker and Jones both stated in their declarations that they were "familiar with

26  it as being a drug stash house and a target of investigations by another law enforcement
    agency."  (Doc. 96, Exh. 1 at ¶ 4; Exh. 2 at ¶ 4.)  Defendants have provided no other

27  evidence to support the assertion that another law enforcement agency was investigating
    the house.

28  [2] The parties dispute whether Vidal-Ramirez exited the home with Jacobo-Esquivel or
    joined him a few minutes later.  (*Compare* Doc. 96 at ¶ 6 *with* Doc. 99 at ¶ 6.)

1    gestured for Vidal-Ramirez to exit the Jeep.  Vidal-Ramirez complied, and Officer

2    Hooker told him to put his hands behind his back.  Vidal-Ramirez complied, and Officer

3    Hooker grabbed Vidal-Ramirez's hands, led him to the back of the Jeep, and frisked him.

4    Officer Hooker felt a bulge near Vidal-Ramirez's waist.  He asked Vidal-Ramirez if it

5    was a gun, which Vidal-Ramirez denied.  Officer Hooker removed a package from Vidal-

6    Ramirez's sweatshirt pocket.   Upon questioning, Vidal-Ramirez admitted that it

7    contained heroin.  Vidal-Ramirez was handcuffed and placed in a police car, where he

8    admitted that drugs and guns were inside the house.

9        Two more officers, Officers Benjamin Catalano and Francisco Banuelos, arrived.

10   The four officers searched the residence without obtaining prior consent.   Officer

11   Banuelos, who speaks fluent Spanish, translated communications between the arrested

12   men and the officers.  Plaintiff alleges that Officer Banuelos coerced Vidal-Ramirez into

13   signing a form stating that he had consented to the search of the residence by telling him

14   that if he did not sign it, any children at the home, including Jacobo-Esquivel's daughter,

15   would be taken into the custody of Arizona Child Protective Services (CPS).  After being

16   so threatened, Vidal-Ramirez signed a form consenting to the search that had already

17   taken place.

18       The officers then transported Jacobo-Esquivel from his home to the parking lot of

19   a CVS, and then to another residence at 7121 W. Toronto Way.  Officer Banuelos asked

20   Jacobo-Esquivel whether that residence contained drugs and guns.   When Jacobo-

21   Esquivel replied that he did not know, Officer Banuelos threatened to tell the occupants

22   of the residence that Jacobo-Esquivel had snitched on them.  After leaving this residence,

23   Officer Hooker took Jacobo-Esquivel to jail and booked him.

24       Defendants' account of the events that transpired differs significantly.  According

25   to Defendants, when Officer Jones exited the patrol car after pulling up in front of the

26   house, Jacobo-Esquivel was standing beside the Jeep with the door open.  Officer Jones

27   asked if Jacobo-Esquivel would talk with him.  Jacobo-Esquivel agreed and then reached

28   into the Jeep and turned it on.

Officer Hooker approached the passenger side and asked Vidal-Ramirez if he would talk with him at the back of the Jeep.  Vidal-Ramirez replied, "Sure," and quickly exited the Jeep.  Officer Hooker noticed a large bulge in Vidal-Ramirez's sweatshirt pocket near the waistband of his pants.  He asked Vidal-Ramirez if it was a gun, which Vidal-Ramirez denied.  He frisked him and heard a "crunch" sound.  Officer Hooker asked Vidal-Ramirez if he had a package containing drugs, and Vidal-Ramirez responded affirmatively and told him it was heroin, and that there was more heroin in the house, along with guns.  He gave verbal permission to search the house.  Officer Hooker then removed the package from Vidal-Ramirez's sweatshirt pocket and handcuffed him.

Officers Benjamin Catalano and Francisco Banuelos arrived.  Vidal-Ramirez told Officer Banuelos, in detail, where to find drugs and guns in the house and identified the key to his room on the keys he had in his pocket.  He also signed a written consent form prior to any search of the house.  Officers Jones and Hooker unlocked Vidal-Ramirez's bedroom door with the keys found in Vidal-Ramirez's pants pocket and searched the room.  They found over two pounds of heroin, over three pounds of cocaine, $3000 in cash, packaging supplies and a scale, ice chests with false bottoms, two guns, and a drug ledger notebook.  After the search, Officer Hooker interviewed Vidal-Ramirez, and he stated that Jacobo-Esquivel helped him to package and deliver drugs supplied to him by a cartel, and that the two of them had been about to make a delivery.

The Jeep Liberty in the driveway was impounded, as was another vehicle which was parked in the garage.

Vidal-Ramirez and Jacobo-Esquivel were charged with possession of dangerous drugs, possession of drug paraphernalia, and misconduct involving weapons.  During the criminal trial, they moved to suppress all evidence on the ground that the officers violated their Fourth Amendment rights against unreasonable search and seizure.

Superior Court of Arizona Judge Dawn Bergin held a five-day evidentiary hearing and made findings of fact that align with Jacobo-Esquivel's account of the events, including that Officer Hooker parked his patrol car directly behind the Jeep in the

driveway of the residence, that the officers were in full uniform and armed with handguns and tasers, that Jacobo-Esquivel and Vidal-Ramirez were seated in the Jeep when Officer Jones approached, and that when Jacobo-Esquivel tried to exit the vehicle, he was ordered back in.  (Doc. 37 at 24.)  The court concluded that "a reasonable person would not feel free to back out of a driveway with a patrol vehicle behind him while two uniformed police officers approached both sides of his car," and therefore a seizure occurred when the officers approached the Jeep.  (*Id.* at 25.)  The court also concluded that even if the police car had not blocked the driveway, the encounter would have been a seizure.  (*Id.*)  The court stated that it "agree[d] with Officers Hooker's and Jones' testimony that they did not have reasonable suspicion to seize [Jacobo-Esquivel and Vidal-Ramirez] until [Vidal-Ramirez] admitted that he was carrying heroin."  (*Id.*)  As such, the court granted the motion to suppress all evidence.  (*Id.*)

The criminal charges against Jacobo-Esquivel and Vidal-Ramirez were dropped.  By that time, the arrested men had spent more than a year and a half in pretrial incarceration.  Additionally, each accrued $60,000 in attorney's fees during the criminal litigation.

Plaintiff Jacobo-Esquivel brings suit under 42 U.S.C. § 1983.

## DISCUSSION

### I.    Legal Standard

The Court grants summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When determining whether summary judgment is appropriate, the Court views the evidence "in a light most favorable to the non-moving party."  *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).  "[A] party seeking summary judgment always bears the initial responsibility of informing the

1   district court of the basis for its motion, and identifying those portions of [the record]

2   which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*,

3   477 U.S. at 323.  The party opposing summary judgment "may not rest upon the mere

4   allegations or denials of [the party's] pleadings, but . . . must set forth specific facts

5   showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Matsushita*

6   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda*

7   *Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).  Substantive law determines

8   which facts are material, and "[o]nly disputes over facts that might affect the outcome of

9   the suit under the governing law will properly preclude the entry of summary judgment."

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact issue is genuine 'if

11   the evidence is such that a reasonable jury could return a verdict for the nonmoving

12   party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting

13   *Anderson*, 477 U.S. at 248).

14   **II.    Analysis**

15           **A.    Collateral Estoppel**

16           "State law governs the doctrine of issue preclusion in federal courts."  *Heath v.*

17   *Cast*, 813 F.2d 254, 258 (9th Cir. 1987).  Under Arizona law, "collateral estoppel does

18   not apply [where] the suppression ruling was interlocutory [and] not final."  *State v.*

19   *Greenberg*, 236 Ariz. 592, 599, 343 P.3d 462, 469 (App. 2015), *review denied* (Sept. 22,

20   2015).  "Additionally, under Arizona law pertaining to criminal prosecutions, collateral

21   estoppel requires a prior 'judgment' and [a] dismissal without prejudice does not

22   constitute a judgment for this purpose."  *Id*.  As such, Judge Bergin's findings of fact,

23   issued after the five-day suppression hearing, are not binding upon this Court.

24           **B.    Seizure of Person**

25           The Fourth Amendment establishes that "[t]he right of the people to be secure in

26   their persons, houses, papers, and effects, against unreasonable searches and seizures,

27   shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S.

28   Const. amend. IV.  "No right is held more sacred, or is more carefully guarded, by the

common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16. "It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Id.* at 17.

A consensual exchange in which a person feels at liberty to decline participation is not a seizure. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Id.* at 497-98. "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotations and citation omitted). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* at 437. "Where the encounter takes place is one factor, but it is not the only one." *Id.* A court must base its determination of whether a person was seized on "the totality of the circumstances." *Id.*

"[T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," and "in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances." *Terry*, 392 U.S. at 20. However, there is "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat— which historically has not been, and as a practical matter could not be, subjected to the

warrant procedure." *Id.*   As such, under *Terry*, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).

Here, Defendants did not have a reasonable suspicion of criminal activity prior to their encounter with Jacobo-Esquivel .   During the evidentiary hearing in the criminal matter, Officer Hooker confirmed that he "had no idea" whether criminal activity was afoot when the officers initially approached Jacobo-Esquivel and Vidal-Ramirez:

> Q:  Now you said you had suspicions.  Do you believe that legally you had reasonable suspicion of criminal activity when you approached them initially?
>
> A:  At that point, no, we didn't really have anything [that] did.  We had our prior contact, but at this time, it could have been an innocent family living there going about their business.  We had no idea at that point.
>
> Q:  And when you say prior contact, you mean prior contact with the house, not necessarily these defendants?
>
> A:  Yeah, not with these defendants, with the people that used to live at the house.

(Doc. 97-6 at 6-7.)

The reasonableness standard is an objective one, so Officer Hooker's subjective assessment that he lacked the reasonable suspicion needed to justify a *Terry* stop is not determinative of the issue.  *Perea-Rey*, 680 F.3d at 1187.   Nonetheless, under an objective standard, the officers did not have a reasonable suspicion that criminal activity was afoot.  "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21.   "[I]n making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?"  *Id.* at 21-22 (internal quotations omitted).  The fact that a year and a half earlier, Officers Hooker and Jones had searched the residence and found a gun there did not establish reasonable

1    grounds to believe that the house had ever been used as a drug stash house, let alone that

2    it continued to be used as such.  The fact that a vehicle not registered to the owner of the

3    house was parked on the driveway does not, without more, rise above the level of "an

4    inchoate and unparticularized suspicion or hunch." *Perea-Rey*, 680 F.3d at 1187

5          An exchange between officers and a person is either a consensual encounter,

6    which is not a seizure, or an investigative stop (a *Terry* stop), which is a seizure.  *United*

7    *States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir. 1987) ("The vast majority of automobile

8    stops are initiated by police officers using flashing lights or a siren and are clearly fourth

9    amendment seizures.  This case, however, presents the unusual problem of characterizing

10    an automobile stop as either a voluntary encounter or an investigative stop.").   An

11    encounter is "consensual" and thus the officers do not need a reasonable suspicion "[s]o

12    long as a reasonable person would feel free to disregard the police and go about his

13    business." *Bostick*, 501 U.S. at 434.  The encounter is a seizure if, "taking into account

14    all of the circumstances surrounding the encounter, the police conduct would have

15    communicated to a reasonable person that he was not at liberty to ignore the police

16    presence and go about his business." *Id.* at 437.

17          In his motion for partial summary judgment, Jacobo-Esquivel argues that he was

18    subjected to a seizure that was not supported by reasonable suspicion, but he asks for

19    summary judgment on Count 4.  (Doc. 95 at 19) ("With regard to count four, Jacobo-

20    Esquivel submits that he had the right to be free from governmental seizure . . . if the

21    seizure was not supported by reasonable suspicion.").  Count 4 alleges that Jacobo-

22    Esquivel was unlawfully *arrested*.  (Doc. 37 at ¶ 76.)  An arrest must be supported by

23    probable cause, whereas "*Terry* established the legitimacy of an investigatory stop in

24    situations where the police may lack probable cause for an arrest." *Arizona v. Johnson*,

25    555 U.S. 323, 330 (2009).  Although at times there are "difficult line-drawing problems

26    in distinguishing an investigative stop from a *de facto* arrest," *United States v. Sharpe*,

27    470 U.S. 675, 685 (1985), asking questions, requiring occupants of a vehicle to exit, and

28    conducting a limited *Terry* frisk of outer clothing to ensure officer safety are all

1    traditionally within the scope of a stop.  *Johnson*, 555 U.S. at 330-31.  Here, Jacobo-

2    Esquivel was eventually arrested, and the lawfulness of that arrest depends on whether

3    the officers had *probable cause* to effectuate the arrest at the time it occurred.

4         Regarding Count 4, the parties do not dispute that at some point after Officers

5    Hooker and Jones stopped Jacobo-Esquivel and Vidal-Ramirez, the officers arrested both

6    men.  However, the parties dispute whether Officer Jones arrested Jacobo-Esquivel

7    before or after Officer Hooker found a package of heroin by frisking Vidal-Ramirez.

8    Jacobo-Esquivel maintains that Officer Jones handcuffed him and placed him under

9    arrest the moment he exited the Jeep, before Vidal-Ramirez was frisked, when the

10   officers still lacked even a reasonable suspicion that criminal activity was afoot, let alone

11   probable cause.  *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest

12   is probable cause, defined in terms of facts and circumstances sufficient to warrant a

13   prudent man in believing that the (suspect) had committed or was committing an

14   offense.").  Because a genuine dispute of material fact exists regarding whether Officer

15   Jones had probable cause to arrest Jacobo-Esquivel, summary judgment on this issue is

16   denied on Count 4.

17        Count 1 of the Complaint relates to the *Terry* standard for determining whether a

18   brief investigatory detention is reasonable, but that count is phrased in such a way that it

19   depends on the resolution of a specific disputed material fact.  Count 1 alleges that

20   "Defendants Hooker and Jones intentionally and unlawfully violated the Plaintiffs' . . .

21   right not to be unlawfully seized *when they blocked the Plaintiff's driveway* . . . without

22   suspecting that a crime had been or was about to be committed."  (Doc. 37 at ¶ 61)

23   (emphasis added).  Whether the driveway was blocked is only one factor in the totality-

24   of-the-circumstances analysis for determining whether the officers' initial approach

25   constituted a stop.  However, as Count 1 is framed, the Court cannot grant summary

26   judgment because a fact-finder must resolve this disputed question of fact.

27        Moreover, viewing the facts in the light most favorable to Defendants, Defendants

28   would enjoy qualified immunity as to whether a stop occurred.  "The doctrine of

1    qualified immunity protects government officials from liability for civil damages insofar

2    as their conduct does not violate clearly established statutory or constitutional rights of

3    which a reasonable person would have known." *Stanton v. Sims*, 134 S. Ct. 3, 4 (2013)

4    (internal quotations omitted).  In order for the law to be "clearly established," there need

5    not be "a case directly on point," but "existing precedent must have placed the statutory

6    or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083

7    (2011).  Courts should not "define clearly established law at a high level of generality"

8    but rather should consider whether a reasonable person would have known the specific

9    conduct at issue violated a right.  *Id.* at 2084.  "Qualified immunity gives government

10   officials breathing room to make reasonable but mistaken judgments about open legal

11   questions," and accordingly "it protects all but the plainly incompetent or those who

12   knowingly violate the law." *Id.* at 2085.  Whether a reasonable person would feel free to

13   disregard the police and go about his business is a close enough call under the facts

14   related by Defendants that qualified immunity would apply.

15        If, however, the disputed fact pleaded in Count 1—that the officers blocked the

16   driveway with their patrol car—were resolved in Jacobo-Esquivel's favor, that fact *in

17   combination with the other circumstances in this case* would conclusively determine that

18   Defendants do not enjoy qualified immunity.  *See United States v. Washington*, 490 F.3d

19   765, 773 (9th Cir. 2007) ("[B]locking an individual's path or otherwise intercepting him

20   to prevent his progress in any way is a consideration of great, and probably decisive,

21   significance in favor of finding a seizure." (internal quotation and citation omitted)).

22   Thus, summary judgment cannot be granted to either party on Count 1.

23        Count 3 of the Complaint also relates to the *Terry* standard for determining

24   whether a brief investigatory detention is reasonable, but that count also depends on the

25   resolution of a disputed material fact.  Count 3 alleges that Officers Hooker and Jones

26   "ordered [Jacobo-Esquivel and Vidal-Ramirez] to exit their vehicle and subsequently

27   frisked [them] without reasonable suspicion or probable cause that a crime had been

28   committed, or that [they] were armed and dangerous."  (Doc. 37 at 71.)  The parties

1    dispute whether Jacobo-Esquivel was ordered to exit the vehicle and whether Officer
2    Hooker discovered that Vidal-Ramirez was carrying heroin before Officer Jones frisked
3    Jacobo-Esquivel.  Thus, the Court cannot grant summary judgment on Count 3.

4         **C.   Curtilage**

5         Count 2 alleges that the seizure of Jacobo-Esquivel's person violated the Fourth
6    Amendment protection against unreasonable seizure because the driveway is curtilage.  If
7    the driveway is curtilage, the officers could not enter the area to search and/or seize
8    without a warrant.  *See Perea-Rey*, 680 F.3d at 1186 ("[B]ecause it was curtilage, it was a
9    constitutionally protected area, and the warrantless entry, search and seizure by the agents
10   violated [defendant's] Fourth Amendment rights.").  "[T]he *Terry* exception to the
11   warrant requirement does not apply to in-home searches and seizures," and therefore any
12   time an officer enters curtilage without consent and detains an occupant in that
13   constitutionally protected area, that officer violates the Fourth Amendment.  *Id.* at 1188.
14   The U.S. Supreme Court has identified four non-exhaustive factors that courts should
15   consider when determining whether an area constitutes curtilage:  "[1] the proximity of
16   the area claimed to be curtilage to the home, [2] whether the area is included within an
17   enclosure surrounding the home, [3] the nature of the uses to which the area is put, and
18   [4] the steps taken by the resident to protect the area from observation by people passing
19   by." *United States v. Dunn,* 480 U.S. 294, 307 (1987).

20        Here, when considering how the *Dunn* factors apply to Jacobo-Esquivel's
21   driveway, an officer could reasonably conclude that the driveway was curtilage—or that
22   it was not.  The short driveway abuts the home, so it is in the closest possible proximity.
23   The driveway and front yard are not enclosed by a fence and Jacobo-Esquivel had taken
24   no steps to protect the area from observation, but the property is a typical suburban tract
25   home in a residential subdivision in which the boundaries of each property are easily
26   identifiable, and the driveway lies squarely in front of the home, taking up a sizeable
27   portion of the front yard.  *See Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984)
28   ("[F]or most homes, the boundaries of the curtilage will be clearly marked; and the

conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience."); *United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001) (noting "the importance of considering whether the area in question is in a rural, urban, or suburban setting"). As for "the nature of the uses to which the area is put," *Dunn*, 80 U.S. at 307, Jacobo-Esquivel used the driveway as a place to park his Jeep. The driveway is also part of the walkway leading to the front door. Although the U.S. Supreme Court has held unequivocally that "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends'" and therefore the front porch constitutes curtilage, the Court has not clearly indicated whether the path leading to the front porch is necessarily curtilage. *Florida v. Jardines*, 133 S. Ct. 1409, 1414-15 (2013) (quoting *Oliver,* 466 U.S. at 182 n. 12).

In 2012, the Ninth Circuit was presented with a case in which a driveway, much like the one at issue here, "was visible from the street, had no fence or gate, and did not have 'No Trespassing' signs on or near it." *United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012). The Ninth Circuit acknowledged in dicta that its precedent might not have established such a driveway as curtilage but declined to resolve the question. *Id.* In a case decided the same year, the Ninth Circuit characterized the driveway in *Pineda-Moreno* as being curtilage:

> In *Pineda–Moreno,* despite the government's admission that agents had, without a warrant, entered the curtilage of the defendant's home to place a mobile tracking device on his car in his driveway, our court concluded that there was no Fourth Amendment violation because Pineda–Moreno had no reasonable expectation of privacy in the curtilage. The Supreme Court recently and emphatically repudiated this reasoning, explaining that "as we have discussed, the *Katz* reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test." *Jones,* 132 S.Ct. at 952.

*Perea-Rey*, 680 F.3d at 1185-86. But the language in *Perea-Rey* suggesting that the *Pineda-Moreno* driveway constituted curtilage does not establish precedent. Neither the U.S. Supreme Court nor the Ninth Circuit has settled the matter of whether a short driveway abutting a home, comprising a sizeable portion of a front yard of a suburban

1  tract home with clearly demarcated boundaries but which is not fenced, covered,
2  obscured from view, or marked with a "No Trespassing" sign constitutes curtilage.

3      Because the matter is an open question of law and a reasonable officer could have
4  believed that the driveway was not curtilage, the officers enjoy qualified immunity on the
5  issue, and the Court need not determine whether Jacobo-Esquivel's driveway did in fact
6  constitute curtilage. *Ashcroft*, 131 S. Ct. at 2080 ("[L]ower courts have discretion to
7  decide which of the two prongs of qualified-immunity analysis to tackle first," and
8  "courts should think carefully before expending scarce judicial resources to resolve
9  difficult and novel questions of constitutional or statutory interpretation that will have no
10  effect on the outcome of the case." (internal quotations and citations omitted)).

11      Because Defendants enjoy qualified immunity, the Court dismisses Count 2 of
12  Jacobo-Esquivel's Complaint.

13      **D.**    **Consent to Search the Home (Count 5)**

14      Jacobo-Esquivel maintains that Vidal-Ramirez never verbally consented to a
15  search of his home and did not provide a written consent to search until after the search
16  already took place.  Defendants counter that the only evidence supporting this claim is
17  Vidal-Ramirez's former testimony, (*see* Doc. 99-21 at 15-17,) which Defendants claim is
18  inadmissible hearsay.  However, this argument misses the mark.  Although former
19  testimony is inadmissible (unless it meets the unavailable declarant standard under
20  Federal Rule of Evidence 804(b)(1)), it is sufficient to establish that admissible evidence
21  may be available at trial.

22      **E.**    **Search of Jeep; Seizure and Forfeiture of Cars and Currency (Count 6)**

23      "[U]nder the automobile exception to the warrant requirement," police officers
24  may "conduct a warrantless search of a vehicle if they have probable cause to believe that
25  it contains contraband."  *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015).
26  The parties do not dispute that the search of the Jeep was conducted after Officer Hooker
27  found 9.65 ounces of heroin on Vidal-Ramirez's person and arrested him.

28      Vehicles used to transport or facilitate the sale of drugs are subject to seizure and

forfeiture under Arizona law, as are all proceeds traceable to a drug-related offense that is chargeable under state law, punishable by imprisonment for more than one year, and is committed for financial gain.  A.R.S. § 13-3413(A), (B).  An officer may seize such items if he or she "has probable cause to believe that the property is subject to forfeiture." A.R.S. § 13-4305(A)(3)(c).

Here, however, issues of fact remain because it is unclear whether the probable cause arose during and as a result of an illegal stop and/or arrest  Therefore, the Court denies summary judgment on Count 6.

### F.      Counts 7-13

Jacobo-Esquivel has acquiesced to the dismissal of Counts 7-13.  (Doc. 98 at 2.) The Court therefore dismisses these counts.

### G.      Punitive Damages

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Viewing the facts in the light most favorable to Jacobo-Esquivel, a reasonable jury could find that the officers' conduct exhibited reckless or callous indifference to Jacobo-Esquivel's Fourth Amendment rights.   Summary judgment on the issue of punitive damages is denied.

**CONCLUSION**

The Court holds that Officers Hooker and Jones enjoy qualified immunity on the issue of whether Jacobo-Esquivel's driveway constitutes curtilage, and therefore the Court grants summary judgment to Defendants on Count 2.

Genuine issues of material fact preclude a grant of summary judgment on Counts 1, 3, 4, 5, and 6.   The Court dismisses Counts 7-13, as Jacobo-Esquivel acquiesced to their dismissal.

A jury could reasonably find facts meriting an award of punitive damages, and therefore summary judgment on punitive damages is denied.

1    **IT IS THEREFORE ORDERED** that the Motion for Summary Judgment by

2    Defendants (Doc. 94) is **DENIED**.

3    **IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment by

4    Plaintiff Jacobo-Esquivel (Doc. 95) is **DENIED**.

5    **IT IS FURTHER ORDERED** that Jacobo-Esquivel's Motion to Strike Doc. 103

6    Statement of Facts (Doc. 104) and Motion for Ruling (Doc. 106) are **DENIED** as moot.

7    Dated this 10th day of February, 2016.

8

9    Honorable G. Murray Snow
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28